## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| LOUIS J. MALBROUGH,<br><br>                    Plaintiff,<br><br>vs.<br><br><br>ZIMMER, INC.; ZIMMER HOLDINGS, INC.;<br>WILSON/PHILLIPS HOLDINGS, INC. a/k/a<br>ZIMMER WILSON PHILLIPS, AND ZIMMER<br>ORTHOPAEDIC SURGICAL PRODUCTS, INC.,<br><br>                    Defendants. | CIVIL ACTION NO.<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED<br><br>SECTION<br><br>MAGISTRATE |

## COMPLAINT

NOW INTO COURT, comes Plaintiff, LOUIS J. MALBROUGH, who files this Complaint and alleges the following upon information and belief:

### BACKGROUND

1.      This is an action for damages suffered by Louis J. Malbrough, as a direct and proximate result of Defendants' wrongful conduct in connection with the development, design, manufacture, distribution, and selling of Defendants' knee replacement products, the Zimmer NexGen CR, the Zimmer NexGen CR-Flex Porous and the Zimmer NexGen LPS Flex Gender Solutions knee replacement systems, (hereinafter "Zimmer NexGen Knee").

2.      Defendants knew or should have known that the Zimmer NexGen Knees can loosen in patients, such as Plaintiff, causing personal injury, significant pain, and loss of movement, and that this injury can only be remedied through subsequent revision surgery and/or knee replacement.  Further, Defendants misled health care professionals and the public into believing that the Zimmer NexGen Knees were safe and effective for use in knee replacement surgery; engaged in deceptive, misleading and unconscionable promotional or sales methods to

convince health care professionals to utilize the Zimmer NexGen Knees, even though Defendants knew or should have known that the Zimmer NexGen Knees were unreasonably unsafe; and failed to warn health care professionals and the public about the safety risks of the Zimmer NexGen Knees.

## PARTIES

3.      Plaintiff, Louis Malbrough, is a natural person and a resident of Terrebonne Parish, Louisiana.

4.      Defendant Zimmer, Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business located in Warsaw, Indiana.

5.      Defendant Zimmer Holdings, Inc. is a corporation organized and existing under the laws of Delaware, and has its principal place of business located in Warsaw, Indiana.

6.      Defendant Wilson/Phillips Holdings, Inc. a/k/a Zimmer Wilson Phillips is a corporation organized and existing under the laws of Texas, and has its principal place of business in Richardson, Texas.

7.      Defendant Zimmer Orthopaedic Surgical Products, Inc. is a corporation organized and existing under the laws of Ohio, and has its principal place of business in Dover, Ohio.

8.      At all relevant times herein, the Zimmer NexGen Knees were designed, developed, manufactured, tested, packaged, promoted, distributed and/or sold by Defendants.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).  The amount in controversy exceeds $75,000.00 exclusive of interest and costs.  There is complete diversity of citizenship between the Plaintiff and Defendants.  Plaintiff is a resident of Terrebonne Parish, Louisiana, and Defendants are two Delaware corporations, with

their principal places of business in the State of Indiana, one Texas corporation, with its principal place of business in the State of Texas, and one Ohio corporation, with its principal places of business in the State of Ohio.

10.     Venue in this action properly lies in this judicial district pursuant to 28 U.S.C. § 1391(a), as a substantial number of the events, actions or omissions giving rise to Plaintiff's claims occurred in this district.  At all times material hereto, Defendants conducted substantial business in this district.

## FACTUAL BACKGROUND

## KNEE REPLACEMENT BACKGROUND

11.     Total knee arthroplasty (TKA), also called total knee replacement, is a common medical procedure performed.  The surgery is designed to help relieve pain and improve joint function in people with severe knee degeneration due to arthritis or trauma.

12.     Upon information and belief, the TKA procedure is done by separating the muscles and ligaments around the knee to expose the inside of the joint. The ends of the thigh bone (femur) and the shin bone (tibia) are removed as is often the underside of the kneecap (patella).

13.     Upon information and belief, about 85 to 90 percent of total knee replacements are successful up to ten years.

14.     *Mechanical loosening* means that for some reason (other than infection) the attachment between the artificial knee and the bone has become loose.

15.     Loosening can occur with any component of the artificial knee:  the femoral, the tibial, or the patellar component.

16.     Upon information and belief, loosening of an artificial knee can be diagnosed using X-ray.  X-ray pictures of a loose knee joint there are one or more radiolucent lines around the contours of the artificial knee joint.

17.     A loose artificial knee is a problem because it causes pain and wearing away of the bone. A painful loose knee can restrict the patient's daily activities severely.  A loose artificial knee also involves severe psychical burden for the patient.

18.     Once the pain becomes unbearable or the individual loses function of the knee, another operation will probably be required to revise the knee replacement.  A loose, painful artificial knee can usually, but not always, be replaced.

19.     The purpose of knee revision surgery is to remove a failed knee implant and replace it with a new one.

20.     Upon information and belief, in a revision operation of a total knee failed by loosening the biggest problem is usually to reconstruct the severe bone loss caused by bone destruction around the failed total knee prosthesis, and restore the stability in the revised total knee.

21.     Upon information and belief, the results of a revision operation are not as good as the first, and the risks of complications are higher.  The range of motion in the knee after the revision surgery may be smaller and the walking capacity may be also diminished.  The rate of loosening is higher after revision surgery than in primary knee replacement surgery.

## ZIMMER NEXGEN KNEE FACTS

22.     Zimmer was founded in 1927, and purports to be a worldwide leader in the design and manufacture of orthopaedic reconstructive, spinal and trauma devices, dental implants, and related orthopaedic surgical products.

23. The Zimmer NexGen Knees use a "high-flex" porous femoral component made of a porous fiber metal and a cobalt-chromium-molybdenum alloy. The cobalt-chromium-molybdenum alloy on the surface that allows bone to grow into the mesh and relies on bone growing into the surface of the implant for fixation.

24. The Zimmer NexGen Knees use this alloy component to attach the bottom of the thigh bone to the replacement knee without traditional cement to glue it in place.

25. The Zimmer NexGen Knees are not cemented in place during implantation, rather the patient's bone is supposed to fuse to the implant. The cement-less implant relies on the bone naturally fusing with the implant. These implants have a surface topography that is conducive to attracting new bone growth.

26. Defendants generally, manufactured, labeled, packaged, distributed, supplied, marketed, advertised, and/or otherwise engaged in all activities that are part and parcel of the sale and distribution of a pharmaceutical, and by said activities, caused the Zimmer NexGen Knees to be placed into the stream of commerce throughout the United States.

27. Defendants made, participated in and/or contributed to filings with the FDA in conjunction with the approval process for the Zimmer NexGen Knees.

28. Upon information and belief, Defendants were in control of the design, assembly, manufacture, marketing, distribution, packaging, labeling, processing, supplying, promotion, sales, and the issuance of product warnings and related information with respect to the Zimmer NexGen Knees.

29. Defendants were at all times material hereto subject to the laws of the United States of America, including provisions relating to the FDA, and the rules and regulations

thereof, in conjunction with the approval process, labeling, and other after-market activities that pertain to the Zimmer NexGen Knees.

30.     The Zimmer NexGen Knees have been widely advertised, marketed and represented by the Defendants as a safe and effective treatment.

## ZIMMER NEXGEN KNEE PROBLEMS

31.     Studies show that a knee implant that allows for higher flexation, like the Zimmer NexGen Knee, is more likely to fail because higher flexation places the implant at a higher risk of loosening.

32.     In addition, The Journal of Bone and Joint Surgery (British Edition) published a peer-reviewed study by professors at the Seoul National University College of Medicine in 2007 titled, High Incidence of Loosening of the Femoral Component in the Legacy Posterior Stabilized-Flex Total Knee Replacement reporting that 38% of implanted LPS high-flex knees were loose shortly after 2 years post-implant.  From the group of patients with loose knees, over half (56%) had knee revision surgery due to pain.

33.     In 2010, Dr. Richard A. Berger, a Zimmer consultant, and his colleague Dr. Craig J. Della Valle, presented a paper at a national meeting of the American Association of Orthopedic Surgeons showing that approximately 9% percent of their patients who had the Zimmer NexGen Knees implanted required revision surgery and 36% showed signs of the knee implant loosening within one year of implant.

34.     On or about September 15, 2010, Defendants sent an "Urgent Device Correction and Removal" notice to surgeons regarding certain LPS high-flex femoral components.

35.     On or about December 2, 2010, the FDA issued a Class II Recall for certain LPS high-flex femoral components because the components exhibited a nonconforming internal CAM radius.  Plaintiff's Zimmer NexGen Knee was one of the systems subject to this recall.

36.     From the time that Defendants first began selling the Zimmer NexGen Knees in the United States, the product labeling and product information for the Zimmer NexGen Knees failed to contain adequate information, instructions, and warnings concerning implantation of the product and the risks that the Zimmer NexGen Knees can loosen in patients.

37.     Despite its knowledge of the serious injuries associated with use of the Zimmer NexGen Knees, Defendants engaged in a marketing and advertising program which as a whole, by affirmative and material misrepresentations and omissions, falsely and deceptively sought to create the image and impression that the use of the Zimmer NexGen Knees was safe.

38.     Upon information and belief, Defendants downplayed and understated the health hazards and risks associated with the use of the Zimmer NexGen Knees and through promotional literature as well as sales visits to orthopaedic surgeons, deceived doctors and potential users of the Zimmer NexGen Knees by relaying positive information, while concealing the nature and extent of known adverse and serious health effects.

## FACTUAL ALLEGATIONS

39.     Prior to September 29, 2005, Plaintiff's treating physician, as well as Plaintiff, were exposed to the aforementioned advertising and marketing campaign directly by the Defendants.

40.     Plaintiff and Plaintiff's physician, either through direct promotional contact with Sales Representatives of Defendants, through word-of-mouth from other health-care providers,

7

and/or through promotional materials, received the information the Defendants intended that they receive: that the Zimmer NexGen Knees were safe and effective for use in TKA procedures.

41.     On September 29, 2005, Plaintiff's physician implanted a Zimmer NexGen Knee into Plaintiff.

42.     Plaintiff began experiencing severe and debilitating pain after implant.

43.     Plaintiff returned to Plaintiff's physician several times due to consistent pain in his knee.

44.     As a direct and proximate result of the use of the Zimmer NexGen Knee, Plaintiff suffered, and continues to suffer, serious bodily injury and harm.

45.     As a direct and proximate result of the use of the Zimmer NexGen Knee, Plaintiff incurred, and continues to incur, medical expenses to treat his injuries and condition.

46.     At no time material to his use of the Zimmer NexGen Knee was Plaintiff or his physicians told, warned, or given information about the higher risks of loosening in the Zimmer NexGen Knees.

### **Federal Requirements**

47.     Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. See 21 U.S.C. § 351.

48.     Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. See 21 U.S.C. § 352.

49.     Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prohibit introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices.  In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury.  Federal law also mandates tat the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health. See 21 U.S.C. § 360i.

50.     Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device but not including an evaluation of the safety or effectiveness of a device), packaging, storage, and installation of a device conform to current good manufacturing practice, as prescribed in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law. 21U.S.C. § 360j(f).

51.     The regulations requiring conformance to good manufacturing practices are set forth in 21 CFR § 820 *et seq*. As explained in the Federal Register, because the Current Good Manufacturing Practice (CGMP) regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device.  Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured, and

the manufacturing processes employed.  Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

52.     Pursuant to 21 CFR § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Food Drug & Cosmetic Act ("the Act") (21 U.S.C. § 351).

53.     Pursuant to 21 CFR § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured. "Quality system" means the organizational structure, responsibilities, procedures, processes, and resources for implementing quality management. See 21 CFR § 820.3(v).

54.     Pursuant to 21 CFR § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

55.     Pursuant to 21 CFR § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

56.     Pursuant to 21 CFR § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

57.     Pursuant to 21 CFR § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

58.     Pursuant to 21 CFR § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

59.     Pursuant to 21 CFR § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design. Design validation shall be performed under defined operating conditions on initial production units, lots, or batches, or their equivalents. Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

60.     Pursuant to 21 CFR § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

61.     Pursuant to 21 CFR § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review, and approval of design changes before their implementation.

62.     Pursuant to 21 CFR § 820.70(a), each manufacturer shall develop, conduct, control, and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications. Such process controls shall include:

A.      Documented instructions, standard operating procedures (SOP's), and methods that define and control the manner of production;

B.      Monitoring and control of process parameters and component and device characteristics during production;

C.      Compliance with specified reference standards or codes;

D.      The approval of processes and process equipment; and

E.      Criteria for workmanship, which shall be expressed in documented standards or by means of identified and approved representative samples.

63.     Pursuant to 21 CFR § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process, or procedure.

64.     Pursuant to 21 CFR § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

65.     Pursuant to 21 CFR § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on product quality.

66.     Pursuant to 21 CFR § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed, and installed to facilitate maintenance, adjustment, cleaning and use.

67.     Pursuant to 21 CFR § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely effect the device's quality.

68.     Pursuant to 21 CFR § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate compute software for its intended use according to an established protocol.

69.     Pursuant to 21 CFR § 820.72, each manufacturer shall ensure that all inspection, measuring, and test equipment, including mechanical, automated, or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results. Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked, and maintained.

70.     Pursuant to 21 CFR § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures.   "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. 21 CFR § 820.3(z)(1).

71.     Pursuant to 21 CFR § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met.  Each manufacturer shall ensure that validated processes are performed by qualified individuals.

72.     Pursuant to 21 CFR § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

73.     Pursuant to 21 CFR § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action. The procedures shall include requirements for:

A.     Analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product, or other quality problems;

B.     Investigating the cause of nonconformities relating to product, processes, and the quality system;

C.     Identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

D.     Verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

E.     Implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

F.     Ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

G.     Submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

**As A Direct And Proximate Result Of Defendants' Failure To Recall Zimmer NexGen Knees earlier, Plaintiff Received A Zimmer NexGen Knee, And Now Has Suffered Pain, Swelling, Decreased Mobility And Potential Need For Revision Surgery**

74.     On or about September 29, 2005, Plaintiff underwent left knee replacement surgery in which a Zimmer NexGen Knee was implanted in his body.

75.     Since the surgical implantation of the Zimmer NexGen Knee, Plaintiff has suffered symptoms including, but not limited to pain, swelling, soreness, difficulty walking, and decreased mobility.

76.     Had Plaintiff known that the Zimmer NexGen Knee caused pain, swelling, inflammation and damage to surrounding bone and tissue as well as a partial or complete lack of mobility, and the potential need for revision surgery to explant the device, Plaintiff would not have elected to have had the Zimmer NexGen Knee implanted.

77.     As a direct and proximate result of the implantation of Zimmer NexGen Knee, Plaintiff has suffered significant harm, including but not limited to physical injury and bodily impairment, debilitating lack of mobility and conscious pain and suffering.

78.     As a direct and proximate result of Defendants' defective Zimmer NexGen Knee, Plaintiff will have to undergo radiographic evaluation, blood testing, and an MRI.

79.     As a direct and proximate result of Defendants' defective Zimmer NexGen Knee, Plaintiff will likely have to undergo another surgery to remove and replace the defective Zimmer NexGen Knee.

80.     As a direct and proximate result of Defendants' defective Zimmer NexGen Knee, Plaintiff has suffered significant harm, conscious pain and suffering, physical injury, bodily impairment, mental anguish and emotional distress.

81.     As a direct and proximate result of Defendants' defective knee replacement implant, Plaintiff has also incurred medical expenses and other economic harm, and will continue to incur such expenses and other economic harm in the future.

82.     At all times material hereto, Defendants, by and through their agents, servants and/or employees, failed to adequately warn physicians and consumers, including Plaintiff, of the risks of the Zimmer NexGen Knees.

83.     At all times material hereto, Defendants, by and through their agents, servants and/or employees, negligently, recklessly and/or carelessly marketed, distributed and/or sold the Zimmer NexGen Knees without adequate instructions or warnings of their serious side effects and unreasonably dangerous risks.

84.     At all times material hereto, the Defendants failed to comply or properly comply with Federal law in connection with the Zimmer NexGen Knees.

85.     At all times material hereto, Defendants either knew or should have known that the Zimmer NexGen Knees were causally related to and associated with severe complications and side effects.

86.     Although Defendants knew or should have known that dangerous risks were associated with the use of the Zimmer NexGen Knees, Defendants proceeded to or permitted the Zimmer NexGen Knees to be advertised, promoted and/or sold without adequate warnings of the serious side effects and dangerous risks.

87.     Defendants breached obligations associated with the Zimmer NexGen Knees including, but not limited to, their testing, the manufacture, design, warning, marketing, and sale.

88.     Defendants expressly warranted to the market, including Plaintiff, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts, advertisements and other materials to the health care and general community, that the Zimmer NexGen Knees were safe, effective, fit and proper for their intended use.

89.     In using the Zimmer NexGen Knee, Plaintiff and his physicians relied on the skill, judgment, representations, and foregoing express warranties of the Defendants.  These warranties and representations proved to be false because the Zimmer NexGen Knees were not safe and were unfit for the use for which they were intended.

90.     As a direct and proximate result of Defendants' breaches of warranties, Plaintiff was injured and suffered damages.

91.     Defendants have breached the implied warranty of merchantability in that but failed to fully disclose were not reasonably fit for the purposes for which it was sold, intended, or reasonably foreseen, to be used.  Moreover, the Zimmer NexGen Knee manufactured and sold by Defendants was defective on the date of delivery to Plaintiff.

92.     Defendants have also breached the implied warranty of fitness for a particular purpose.  The Zimmer NexGen Knee is not reasonably fit for the specific purposes for which Defendants knowingly sold it and for which Plaintiff bought it, in reliance on Defendants.

93.     Plaintiff has suffered damages as a result of Defendants' breach of warranty.

94.     Defendants have a duty to exercise the necessary degree of care expected and required of manufacturers of health care products.  Defendants deviated from that duty by failing to warn of the risks in using the Zimmer NexGen Knees.

95.     Defendants failed to adequately warn Plaintiff of the hazards of the Zimmer NexGen Knees and concealed this knowledge from Plaintiff and others.  As a result of this failure, Plaintiff was caused to suffer the injuries and damages as set forth herein.

96.     Defendants falsely misrepresented and concealed pertinent facts regarding the Zimmer NexGen Knees including, without limitation, the absence of adequate testing, the lack of

proper manufacturing practices, the severity and frequency of side effects, and adverse medical conditions caused by the Zimmer NexGen Knees.

97.     Defendants failed to take measures to ensure that the recipients of the Zimmer NexGen Knees were notified fully and completely of the risks of the Zimmer NexGen Knees, and/or that physicians and health care providers were notified of these risks.

98.     The Defendants failed to adequately warn consumers of the harmful side effects and potential adverse health effects of the Zimmer NexGen Knees.  The Zimmer NexGen Knee was dangerous and defective at the time it was marketed by Defendants, and at the time it was surgically implanted into Plaintiff.

99.     The dangerous and defective conditions of the Zimmer NexGen Knee proximately caused the injuries Plaintiff alleges herein, all while the Zimmer NexGen Knee was used for its ordinary intended purpose and in the ordinary intended manner.  The injuries alleged here by Plaintiff and damages suffered were the direct and proximate result of the marketing and sale by Defendants of the defective and unreasonably dangerous Zimmer NexGen Knees.

100.    Defendants failed to properly and adequately test the Zimmer NexGen Knees.

101.    As a result of his use of the Zimmer NexGen Knee, Plaintiff has sustained the following non-exclusive list of damages:

A.     Physical injuries;

B.     Past and future emotional distress;

C.     Loss of enjoyment of life;

D.     Past and future mental pain and suffering;

E.     Inconvenience;

F.     Past and future physical pain, suffering and disability;

G.      Medical expenses;

H.      Other damages to be proven at the trial of this matter.

### FRAUDULENT CONCEALMENT

102.    The running of any statute of limitations has been tolled by reason of Defendants'
fraudulent concealment.   Defendants, through their affirmative misrepresentations and
omissions, actively concealed from Plaintiff and his physicians the true risks associated with the
Zimmer NexGen Knees.

103.    As a result of Defendants' actions, Plaintiff and his physicians were unaware, and
could not reasonably have known or have learned through reasonable diligence, that he had been
exposed to the risks alleged herein and that those risks were the direct and proximate result of
Defendants' acts and omissions.

### COUNT ONE

### LOUISIANA PRODUCTS LIABILITY ACT

104.    Plaintiff hereby restates and realleges each and every allegation set forth above,
with the same force and effect as if herein repeated and set forth at length.

105.    The Zimmer NexGen Knee proximately caused damage to the Plaintiff, which
damage was caused by a characteristic of the Zimmer NexGen Knee that rendered it
unreasonably dangerous arising from a reasonably anticipated use of the Zimmer NexGen Knee
by Plaintiff, thus rendering Defendants liable to Plaintiff pursuant to LSA R.S. 9:2800.54.

106.    The Zimmer NexGen Knees are unreasonably dangerous for the following
reasons:

A.      They are unreasonably dangerous in construction or composition as provided in
        LSA R.S. 9:2800.55;

B.      They are unreasonably dangerous in design as provided in LSA R.S. 9:2800.56.

C.      They are unreasonably dangerous because an accurate warning about the Zimmer NexGen Knees were not provided as required by LSA R.S. 9:2800.57.

D.      They are unreasonably dangerous because they do not conform to an express warranty of the manufacturer about the Zimmer NexGen Knees as provided in LSA R.S. 9:2800.58.

107.    The characteristics of the Zimmer NexGen Knees that render them unreasonably dangerous under LSA R.S. 9:2800.55, LSA R.S. 9:2800.56, and LSA R.S. 9:2800.57 *et seq.* existed at the time the Zimmer NexGen Knees left the control of the manufacturer or resulted from a reasonably anticipated alteration or modification of the Zimmer NexGen Knees.

108.    The Zimmer NexGen Knees manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendants, were defective in their manufacture and construction when they left the hands of Defendants in that they deviated from Zimmer NexGen Knees' specifications and/or applicable federal requirements for these medical devices, posing a serious risk of injury and death.

109.    As a direct and proximate result of Plaintiff's use of the Zimmer NexGen Knee, as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendants and/or the failure to comply with federal requirements, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

110.    For all of the reasons alleged herein, the Zimmer NexGen Knees were unreasonably dangerous in design at the time the Zimmer NexGen Knees left the manufacturer's control in that:

A.     There existed an alternate design for the Zimmer NexGen Knees that was capable of preventing the Plaintiff's damages; and

B.     The likelihood that the Zimmer NexGen Knee's design would cause the Plaintiff's damages and the gravity of those damages outweigh the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the Zimmer NexGen Knees.

111.    For all of the reasons alleged herein, the Zimmer NexGen Knees are unreasonably dangerous because an adequate warning about the Zimmer NexGen Knees had not been provided and at the time the Zimmer NexGen Knees left the manufacturer's control, the Zimmer NexGen Knees possessed a characteristic that may cause damage and the manufacturer failed to use reasonable care to provide adequate warning that such characteristic and its dangers to users of the Zimmer NexGen Knees.

112.    Further, Defendants, after the Zimmer NexGen Knees left their control, acquired knowledge of the characteristic of the Zimmer NexGen Knees that may cause damage and the danger of such characteristic (or, alternatively, Defendants would have acquired such knowledge if they had acted as reasonable prudent manufacturers), and thus are liable for damages suffered by Plaintiff which arose as a consequence of Defendants' failure to use reasonable care to provide an adequate warning of such characteristic and its dangers to users.

113.    Defendants expressly warranted to the market, including Plaintiff, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts, advertisements and other materials to the health care and general community, that the Zimmer NexGen Knees were safe, effective, fit and proper for their intended use.

114.   In using the Zimmer NexGen Knee, Plaintiff and his physicians relied on the skill, judgment, representations, and foregoing express warranties of the Defendants.  These warranties and representations proved to be false because the Zimmer NexGen Knees were not safe and were unfit for the use for which they were intended.

## COUNT TWO

## VIOLATION OF WARRANTY OF REDHIBITION

115.   Plaintiff hereby restates and realleges each and every allegation set forth above, with the same force and effect as if herein repeated and set forth at length.

116.   Defendants were aware of the substantial risks from using the Zimmer NexGen Knees but failed to fully disclose the same.

117.   Defendants, as the manufacturer of the Zimmer NexGen Knees, are deemed to be aware of its redhibitory defects pursuant to LSA-C.C. Article 2545.

118.   Had Plaintiff been aware of the defects contained in the Zimmer NexGen Knees, Plaintiff would not have purchased the Zimmer NexGen Knee.  These characteristics rendered them unfit for their intended purposes.

119.   Defendants are liable to Plaintiff under theory of redhibition as a consequence of the sale to Plaintiff of a Zimmer NexGen Knee unfit for its intended use.

120.   Plaintiff is entitled to  return of any purchase price paid, including but not limited to, insurance co-payments, interest on these amounts from the date of purchase, attorneys fees and costs, pecuniary and non-pecuniary damages, as well as any other legal and equitable relief to which Plaintiff may be entitled.

## JURY DEMAND

121.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays:

a)    that process issue according to law;

b)    that each Defendant be served with a copy of Plaintiff's Complaint and show cause why the prayers for relief requested by Plaintiff should not be granted;

c)    that Plaintiff be granted a trial by jury in this matter;

d)    that the Court enter judgment against each Defendant, jointly and severally, for all general and compensatory damages allowable to Plaintiff;

e)    that the Court enter judgment against each Defendant, jointly and severally, for all hedonic damages allowable to Plaintiff;

f)    that the Court enter judgment against each Defendant, jointly and severally, for all other special damages allowable to Plaintiff;

g)    that the Court enter judgment against each Defendant, jointly and severally, for all other relief sought by Plaintiff under this Complaint;

h)    that the Court render judgment in favor of the Plaintiff, awarding all damages as prayed for herein, including attorneys' fees, with all costs assessed against Defendant.

i)    that the Court grant Plaintiff such other and further relief to which the Court deems just and appropriate.

Dated: June 10, 2011

DUGAN LAW FIRM, PLC

  /S/ Douglas R. Plymale
Douglas R. Plymale, (La. Bar No. 28409)
Of Counsel
James R. Dugan, II (La. Bar No. 24785)
One Canal Place
365 Canal Street, Suite 1000
New Orleans, LA 70130
Telephone:     (504) 648-0180
Facsimile:     (504) 648-0181

Frank J. D'Amico, Jr. (La. Bar No. 17519)
Reed Bowman (La. Bar No. 30408)
THE LAW OFFICES OF
   FRANK J. D'AMICO, JR., PLC
622 Baronne Street, 2nd Floor
New Orleans, LA 70113
Telephone:  (504) 525-7272
Facsimile:   (504) 525-9522

Attorneys for Plaintiff